UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

THE UNION LABOR LIFE INSURANCE  :
COMPANY,                        :
                Plaintiff,        :
                                  :
v.                              :    C.A. No. 15-152ML
                                  :
J. BRIAN O'NEILL,               :
                Defendant.        :

**REPORT AND RECOMMENDATION**

PATRICIA A. SULLIVAN, United States Magistrate Judge.

This matter is before the Court for report and recommendation on the motion of Plaintiff The Union Labor Life Insurance Company ("ULLICO") (ECF No. 22) for partial summary judgment on two counts of its Complaint (ECF No. 1). Defendant is J. Brian O'Neill ("O'Neill") a Philadelphia-based real estate developer. The dispute results from a financing arrangement between the parties in connection with the development and marketing of a luxury condominium high-rise in Portsmouth, Rhode Island, known as Carnegie Tower at Carnegie Abbey, and related property, such as bathing cabanas and parking spaces ("the property").

Initially, financing for the development of Carnegie Tower was obtained from another lender in 2006 by two companies for which O'Neill serves as a principal, Carnegie Tower Development Co., Inc., and Carnegie Holdings, LLC. In 2012, these O'Neill companies refinanced the loan with ULLICO, with an Amended and Restated Loan Agreement dated March 20, 2012 ("the Loan Agreement"). ECF No. 1-1. At the same time, O'Neill himself signed a separate agreement, which provided ULLICO with a guaranty, personally ensuring the loan obligations ("the Guaranty"). ECF No. 1-2. After the two O'Neill companies defaulted on the Loan Agreement, on April 10, 2014, ULLICO and O'Neill personally, together with the two

O'Neill companies and Elliott Street Associate, L.P., another O'Neill company (collectively, the "O'Neill Entities"), entered into the third of the three relevant agreements, the Forbearance Agreement ("the Forbearance Agreement" or "FA").  ECF No. 1-5.  The purpose of the Forbearance Agreement was to extend the terms of the Loan Agreement and the Guaranty to provide the O'Neill Entities with additional time to sell the property and repay the loan.  FA § 1.14.  According to ULLICO, the O'Neill Entities defaulted on the Forbearance Agreement almost immediately when they failed to make a real estate tax payment on April 30, 2014.  Based on that breach, ULLICO exercised its rights under the Forbearance Agreement, taking title to the property and demanding that O'Neill honor his obligations under the Guaranty and the Forbearance Agreement.  When O'Neill refused, ULLICO filed this lawsuit based on the parties' diversity of citizenship, Complaint ¶¶ 1-3, ECF No. 1, alleging in Count I that O'Neill breached the Guaranty, in Count II that he breached the Forbearance Agreement, and in Count III that he breached the covenant of good faith and fair dealing.  Complaint ¶¶ 20-27.

ULLICO now moves for partial summary judgment on Counts I and II, on the issue of liability only.  Based on the parties' submissions and on oral argument, I recommend that the Court find that the undisputed facts establish that O'Neill is liable to ULLICO as a matter of law on Counts I and II of its Complaint and enter partial summary judgment with respect to liability on those Counts in ULLICO's favor.

## I.    BACKGROUND[1]

---

[1] Consistent with the Court's Local Rules, the parties filed statements of disputed and undisputed facts.  They are referred to in this report and recommendation as "PSUF ¶ __" and "PSDF ¶ __" for ULLICO's statements, ECF Nos. 22-2, 29, and as "DSUF ¶ __" and "DSDF ¶ __" for O'Neill's statements, ECF Nos. 24-3, 24-4.

According to the <u>Providence Journal</u>,[2] Defendant O'Neill is a real estate developer who developed Carnegie Tower, a luxury condominium complex in Portsmouth, Rhode Island.  The 79-unit Tower opened in the summer of 2009 but, reportedly, sales were slow due to the economic downturn.  On March 20, 2012, with only two units sold, Carnegie Tower Development Co., Inc., and Carnegie Holdings, LLC, both O'Neill-controlled companies, refinanced the underlying loan with Plaintiff ULLICO by entering into the Loan Agreement, pursuant to which ULLICO also made certain cash advances to the O'Neill entities.  Loan Agreement at 1.  The Loan Agreement specifies that it is to be "construed and enforced in accordance with, the laws of the State of Rhode Island," except for the applicable interest rate.  Loan Agreement § 9.9.  On the same date, O'Neill signed the Guaranty, "absolutely and unconditionally" ensuring that he would individually pay and perform specified obligations at the termination of the Loan Agreement.  Guaranty § 1.  Among other obligations, O'Neill guaranteed the payment of all operating expenses in connection with the property, including real estate taxes.  Guaranty § 1; <u>see</u> Loan Agreement § 1(rr) (defines "operating expenses" to include "real estate taxes").  The Guaranty provides that it is to be "construed and interpreted in accordance with and . . . governed by" Rhode Island law.  Guaranty § 17.

Thereafter, as acknowledged in the Recitals in the Forbearance Agreement, Carnegie Tower Development Co., Inc., and Carnegie Holdings, LLC defaulted on the Loan Agreement.  FA at 2.  Based on the default, ULLICO accelerated the loan and made demand for full payment on January 7, 2014.  Complaint, Ex. D; ECF No. 1-4.  However, instead of ULLICO proceeding to exercise its rights arising from the default, with the Loan Agreement and the Guaranty

---

[2] <u>See</u> <u>Providence Journal</u>, "Hard Times for Carnegie Tower: Recession, soft market leaves luxury highrise in Portsmouth mostly empty," July 24, 2015.  This citation is provided to supplement the reader's background information – the referenced article is not part of the record on this motion and has not been considered by the Court in formulating this report and recommendation.

remaining in effect, ULLICO and the O'Neill Entities entered into the Forbearance Agreement on April 10, 2014.  Its stated purpose is "to provide Borrower with a period of time to market and sell the Mortgaged Property in order to repay the Loan in full."  FA § 1.14.

The Forbearance Agreement defines this period of time, during which ULLICO committed to forbear from exercising its rights, as the Forbearance Period.  Under the terms of the Forbearance Agreement, the Forbearance Period was to expire automatically no later than July 18, 2014.  FA § 2.1.  Central to the Forbearance Agreement was the requirement that the O'Neill Entities place the deed to the property in escrow with irrevocable instructions that ULLICO could record the deed in lieu of foreclosure in the event of the borrowers' default.  FA §§ 3, 14.  The Forbearance Agreement further obligates Carnegie Tower Development Co., Inc., and Carnegie Holdings, LLC, the two O'Neill-controlled companies, to pay – by April 30, 2014 – the third-quarter real estate taxes, which had been due since March 1.  FA § 5.  The failure to pay these real estate taxes "at the time or times specified" (April 30, 2014) is defined by the Forbearance Agreement as an "Event of Default."  FA § 11.11.  Upon the occurrence of such an Event of Default, the Forbearance Agreement provides that "[t]he Forbearance Period shall immediately and automatically cease without notice or further action without notice to, or action by, any party."  FA § 12.1.  Also upon such an Event of Default, ULLICO had the right to record the escrowed deed, as well as to exercise its other rights under all three of the agreements.  FA §§ 12.2, 12.3.

On its part, ULLICO, as it had under the Loan Agreement, agreed to pay "protective advances," that is, disbursements to cover the expenses of maintaining and marketing the property.  FA § 4.  Once certain conditions were satisfied, the requests for disbursements were to be approved by ULLICO within ten business days of their submission, and disbursements were

to be made within thirty days of the request.  Loan Agreement § 6.  However, if an Event of Default (such as the failure to pay the real estate taxes on April 30, 2014) occurred, ULLICO would automatically, "without notice to or action by any party," be released from its obligation to make protective advances.  FA § 4.

Like the Guaranty, the Forbearance Agreement stipulates that it is to be "governed by and construed in accordance with" Rhode Island law.  FA § 16.7.

As a condition precedent to the effectiveness of the Forbearance Agreement, and essential to trigger the commencement of the Forbearance Period, the O'Neill Entities were required to deliver to ULLICO certain documents, which are enumerated in Section 3.1.  Among the listed documents are certain "Escrowed Conveyance Documents," which are defined in Section 14(a) and include the deed for the property and other documents essential to permit ULLICO to take title to the property.  FA § 14(a).  These were to be held in escrow by a title company consistent with the provision of the Forbearance Agreement that the title company would immediately record the deed upon receipt of written instructions from ULLICO either that the Forbearance Agreement had expired or that an Event of Default had occurred.  FA §§ 3.1(a), 14(a); see FA § 12.2.  Also among the enumerated documents, Section 3.1(f) permitted ULLICO to ask for "such other documents and as Lender may request with respect to any matter relevant to this Agreement or the transactions contemplated hereby;" if ULLICO made such a request, the requested material must be received "in substance and form acceptable" to ULLICO before the Forbearance Agreement could become effective.  FA§ 3.1(f).  It is undisputed that the Escrowed Conveyance Documents defined in Section 14(a) were delivered to ULLICO to be held by the title company on April 29, 2014.  DSUF ¶ 65; PSDF ¶ 65.

A different provision of the Forbearance Agreement required other specified documents to be escrowed with the title company; these consisted of conditionally executed resignations or terminations related to "all ancillary rights in and to the Mortgaged Property," specifically the resignations/terminations of the trustees, property manager and marketing agent of the condominium association.  FA § 14(b).  The latter set of documents was to be held in escrow during the Forbearance Period, becoming effective only when it terminated.  FA § 14(b).  The second set was delivered to ULLICO's counsel on May 1, 2014.  DSUF ¶ 68; PSDF ¶ 68.  The term "Escrowed Conveyance Documents," which is defined in Section 14(a), does not include these resignation/termination documents.

To summarize the operative events, after executing the Forbearance Agreement on April 10, 2014, on April 29, 2014, pursuant to Section 14(a), the Escrowed Conveyance Documents were transmitted to the title company.  On the same day, the two O'Neill companies (Carnegie Tower Development Co., Inc., and Carnegie Holdings, LLC) submitted a request for a protective advances to ULLICO.  However, on April 30, 2014, the O'Neill Entities did not pay the third quarter real estate taxes; nor have they paid them since.  PSUF ¶¶ 57-58; DSDF ¶¶ 57-58.  The next day, May 1, 2014, pursuant to Section 14(b), the condominium association contingent resignations and termination were provided to ULLICO's counsel for delivery to the title company.  On May 13, 2014, the date by which ULLICO would have been obliged to respond to the April 29 request for a protective advance, PSUF ¶ 9, ULLICO apparently did not respond; nor has it responded to the request since.[3]

---

[3] O'Neill did not submit evidence of ULLICO's non-response to the request for a protective advance in connection with the pending motion.  I include the fact here based on the representation of O'Neill's counsel in his brief and during oral argument.  See ECF No. 24 at 12.  Because O'Neill did not present this as a fact, ULLICO has not taken a position regarding whether it responded to the advance request.  Its brief states only that O'Neill's failure to pay the real estate taxes relieved it of its obligation to respond to or pay protective advances.  ECF No. 22-1 at 15-16.  Because this fact would be material to the outcome of the pending motion if this Court were inclined to accept O'Neill's argument that the O'Neill Entities had a "reasonable time" to pay the real estate taxes, which is discussed

On July 28, 2014, an attorney for ULLICO sent an email to an attorney working on behalf of O'Neill. ECF No. 24-1 at 2. Because of its importance to the parties' dispute, the relevant portion is included in its entirety:

> As you know, the Forbearance Period expired on July 18. ULLICO is willing to extend out the Forbearance Period until August 31, 2014, but no later, on the condition that your client pays the March real estate taxes by August 15. Also, an expense payment in the amount of $48,922.50 is due on July 30. Please advise your client accordingly.
> ULLICO continues to reserve all rights and remedies.

ECF No. 24-1 at 2. There is no evidence in the record indicating that this invitation to renegotiate the Forbearance Agreement resulted in an agreement to revive the Forbearance Period (or any other agreement). Instead, on January 14, 2015, ULLICO took title to the property by recording the deed in lieu of foreclosure. Answer ¶ 15. On March 24, 2015, ULLICO demanded payment of over $2 million from O'Neill based on his obligations as set out in the Guaranty. Complaint Ex. F, ECF No. 1-6. O'Neill has not made any payment pursuant to the Guaranty. Complaint ¶¶ 19; Answer ¶ 19, ECF Nos. 1, 9. ULLICO also contends that O'Neill is in breach of his obligations under the Forbearance Agreement; O'Neill denies that averment. Complaint ¶ 26; Answer ¶ 26, ECF Nos. 1, 9. ULLICO filed this lawsuit on April 16, 2015.

Because O'Neill has placed the parties' discovery disputes in issue in connection with the summary judgment motion, a brief description of those hotly disputed facts is necessary. O'Neill is represented by the Philadelphia law firm of Kaufman, Coren & Ress. Originally Attorney James Cousounis had primary responsibility for the case. Declaration of Attorney Steven Coren ¶ 5, ECF No. 24-2. On April 15, 2016, Mr. Cousounis suffered a medical emergency, and has

---

*infra*, O'Neill's failure to present competent evidence of what he contends is ULLICO's prior breach is potentially an independent reason to grant ULLICO's motion for summary judgment. If the Court adopts this report and recommendation, this issue is moot.

not returned to work since.  ECF No. 24-2 ¶ 18.  Prior to this emergency, ULLICO had objected to many of O'Neill's discovery requests and Mr. Cousounis and ULLICO's counsel were conferring about discovery disputes.  ECF No. 24-2 ¶ 14.  As O'Neill recounts the events, to accommodate ULLICO's need for more time to produce documents, the parties filed a joint motion to extend the discovery deadlines, which was granted by the Court on April 15, 2016. ECF No. 24-2 ¶ 16; see ECF No. 21.  ULLICO's counsel disagree, averring that the extension was based on the need of both parties to take depositions and that ULLICO had disclosed to Mr. Cousounis the likelihood of an imminent filing of a summary judgment motion.  ECF No. 28 ¶¶ 15-17.

As a result of whatever was discussed, the fact discovery deadline was extended to August 29, 2016, and expert discovery was extended until December 2016, while the dispositive motion deadline was pushed out to January 2017.  ECF No. 21.  Despite the extension, O'Neill claims, and ULLICO disputes, that ULLICO failed fully to comply with O'Neill's discovery requests, and instead filed its motion for summary judgment on May 31, 2016; ULLICO disagrees, averring that it completed the discovery required by the parties' compromise and provided a privilege log, all consistent with an agreement reached with Mr. Cousounis to which Mr. Coren was not privy as far as the ULLICO team was aware.  ECF No. 24-2 ¶¶ 19-20; ECF No. 28 ¶¶ 12-14, 18.  ULLICO strenuously disputes the implication that it filed the summary judgment motion prematurely to take advantage of Mr. Cousounis's illness; its attorneys aver that they were not aware of the medical event until after the motion was filed.  ECF No. 27 ¶ 31; ECF No. 28 ¶ 19

The other discovery event material to the summary judgment motion occurred after the motion was pending.  On August 22, 2016, the parties filed a joint motion to stay discovery.

ECF No. 30.  In addition to asking for the stay, this joint motion advised the Court that the

parties had agreed that the discovery deadlines would likely need to be reset depending on the

outcome of the summary judgment motion.  ECF No. 30 ¶ 6.  In the joint motion, the parties

acknowledge that each has produced "in rolling batches thousands of pages of responsive

documents (together with privilege logs) in response to requests for production of documents and

ESI" and that "[r]esolution of Plaintiff's summary judgment motion will determine whether there

is any further need for discovery on liability issues or only potentially Plaintiff's alleged

damages."  ECF No. 30 ¶ 5.  In reliance on the parties' joint representations, the Court granted

the stay motion.  ECF No. 31.

## II.      STANDARD OF REVIEW

Under Fed. R. Civ. P. 56, summary judgment is appropriate if the pleadings, the

discovery, disclosure materials and any affidavits show that there is "no genuine issue as to any

material fact and that the movant is entitled to judgment as a matter of law."  Taylor v. Am.

Chemistry Council, 576 F.3d 16, 24 (1st Cir. 2009); Commercial Union Ins. Co. v. Pesante, 459

F.3d 34, 37 (1st Cir. 2006) (quoting Fed. R. Civ. P. 56(c)).  A fact is material only if it possesses

the capacity to sway the outcome of the litigation; a dispute is genuine if the evidence about the

fact is such that a reasonable jury could resolve the point in the favor of the non-moving party.

Estrada v. Rhode Island, 594 F.3d 56, 62 (1st Cir. 2010); Santiago-Ramos v. Centennial P.R.

Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000) (quoting Sánchez v. Alvarado, 101 F.3d 223, 227

(1st Cir. 1996).  The evidence must be in a form that permits the court to conclude that it will be

admissible at trial.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).  In ruling on a

motion for summary judgment, the court must examine the record evidence "in the light most

favorable to, and drawing all reasonable inferences in favor of, the nonmoving party."  Feliciano

de la Cruz v. El Conquistador Resort & Country Club, 218 F.3d 1, 5 (1st Cir. 2000) (citing

Mulero-Rodriguez v. Ponte, Inc., 98 F.3d 670, 672 (1st Cir. 1996)).  .

In this case, the crux of the parties' dispute concerns the interpretation of certain

provisions of the Loan Agreement, the Guaranty and the Forbearance Agreement.  Because their

authenticity is not disputed, O'Neill's Answer, ECF No. 9 ¶¶ 6, 8, 11, and neither party contends

that their relevant terms are ambiguous, this is a matter that is readily resolvable at the summary

judgment stage.  Young v. Warwick Rollermagic Skating Ctr., 973 A.2d 553, 558 (R.I. 2009)

("When a contract is determined to be clear and unambiguous, then the meaning of its terms

constitute a question of law for the court.").

## III.   ANALYSIS

ULLICO argues that the O'Neill Entities committed a breach of the Forbearance

Agreement, which amounted to an Event of Default, when they failed to make the overdue

payment for the third quarter real estate taxes by the date specified in the Agreement, April 30,

2014.  Consequently, it contends, the Forbearance Period ended, permitting ULLICO to proceed

against O'Neill personally for his breach of the Guaranty, as well as to exercise all of its rights

against him as a party to the Forbearance Agreement.  In response, O'Neill makes three

somewhat creative arguments, as seems to be his wont when a personal guaranty is in issue.

HSBC Realty Credit Corp. (USA) v. O'Neill, 745 F.3d 564, 570 (1st Cir. 2014) (describing

O'Neill's "barrage of arguments" to avoid liability for breach of personal guaranty).

I test each in turn.

### A.   Escrowed Document Delivery and Due Date of Real Estate Tax Payment

The basic outline of O'Neill's first argument is that the Forbearance Agreement did not

become effective until May 1, 2014, when the second batch of escrowed documents (the

conditional resignations and terminations of the condominium association personnel) were

delivered to the title company, rather than on April 29, 2014, upon delivery of the deed and

related conveyancing materials to the title company.  ECF No. 24 at 6; DSUF ¶ 71.  According to

O'Neill's reasoning, since the Forbearance Agreement was not in effect as of April 30, 2014,

when the O'Neill Entities were required to pay the third-quarter real estate taxes, that deadline

was extinguished; instead, the O'Neill Entities were required to pay the taxes only within some

unspecified "reasonable time."  And before that "reasonable time" had elapsed, there is a

material factual dispute whether ULLICO itself breached the Forbearance Agreement by failing

to respond to the request for a protective advance, which had been submitted on April 29, 2014.[4]

Based on these premises, O'Neill concludes that there is a trial-worthy issue over whether

ULLICO's prior breach discharged O'Neill from any personal liability under either the Guaranty

or the Forbearance Agreement.

This syllogism collapses under the weight of the unambiguous language of the

Forbearance Agreement.

For starters, the effective date of the Forbearance Agreement is controlled by Section 3,

"Conditions Precedent," which provides, "[t]his Agreement shall not become effective unless

and until the date (the "Effective Date") that each of the following conditions shall have been

satisfied in Lender's sole discretion, unless waived in writing by Lender."  The condition that is

material to this motion is set out in Subsection 3.1, "Delivery of Certain Documents," which

requires that certain defined "Escrowed Conveying Documents," also referred to as "Escrowed

Conveyance Documents," must be conveyed to the title company.  The "Escrowed Conveyance

Documents" are further defined in Section 14(a) as follows:

---

[4] But see n.3 *supra*.

> [A]n executed and acknowledged deed or deeds of the unsold units and the Elliot Street property (collectively, the "Deeds" and singly, a "Deed"), the assignments of all Sale Amenities, and assignment of all contracts and contract rights, a bill of sale to all personal property, a transfer of declarant's rights under the Condominium Documents and an affidavit of estoppel and solvency (which Borrower parties agree to execute from time to time upon request by Lender) and such other instruments of conveyance, assignment or transfer as Lender may deem necessary or desirable from time to time to transfer all of the Mortgaged Property to Lender or its designee, all in form and substance acceptable to Lender and the Title Company (together with the Deeds, collectively, the "Escrowed Conveyance Documents").

FA § 14(a).  It is undisputed that the specific documents described in this paragraph were duly delivered to the title company on April 29, 2014.  DSUF ¶ 65.

The second set of documents, the delivery of which O'Neill now says was also necessary for the commencement of the Forbearance Agreement, are specifically described in Section 14(b):

> The Borrower Parties, and any and all affiliates thereof, shall deliver in escrow to the Title Company, executed resignations or terminations of all ancillary rights in and to the Mortgaged Property, including without limitation, as condominium trustees, property manager, marketing agent or the like.  Such resignations and terminations shall be released from escrow and shall be effective immediately upon a Forbearance Termination.

These documents were delivered to the ULLICO's counsel via email on May 1, 2014.  O'Neill argues that the delivery of this second batch also constituted a condition precedent to the Forbearance Agreement becoming effective.  The problem is that this second set is not mentioned in the list of "Conditions Precedent" that control the effective date of the Forbearance Agreement; rather, it is separately listed and plainly not included in the "Conditions Precedent" set.  FA §§ 3, 14.  Accordingly, while the delivery of these documents was contractually required, it was not one of the conditions controlling the setting of the effective date of the Agreement.

O'Neill tries to sidestep the plain language of the Agreement by arguing that the set delivered on May 1 falls into the last item on the list of documents to be delivered as "Conditions Precedent," a catch-all that required the delivery of "such other documents and as Lender may request with respect to any matter relevant to this Agreement or the transactions contemplated thereby."  FA § 3.1(f).  The fatal flaw in this argument is that the tranche of material provided on May 1, 2014, is simply not an after-requested document as described in the catch-all provision. Rather, it consists of, and is limited to, the documents named in the Forbearance Agreement as necessary for the shift of control and management of the condominium association – this group of documents is separately and specifically listed in Section 14(b) and is not in the list of "Condition Precedent" documents.  It defies basic principles of contract interpretation to conflate the specific obligation in Section 14(b) with the general catch-all in Section 3.1(f).  See Littlefield v. Acadia Ins. Co., 392 F.3d 1, 9 (1st Cir. 2004) (doctrine of *ejusdem generis* requires that general words that follow enumeration in words of particular meaning are construed as applying only to persons or things of same kind or class as those specifically mentioned).  Thus, the undisputed facts and the plain and unambiguous language of the Forbearance Agreement establish as a matter of law that it became effective on April 29, 2014.  HSBC Realty Credit Corp., 745 F.3d at 574; Rivera v. Gagnon, 847 A.2d 280, 284 (R.I. 2004) ("If the contract terms are clear and unambiguous, judicial construction is at an end for the terms will be applied as written.").

While not necessary when the plain-meaning conclusion is so clear, it is useful to step back to see whether this interpretation is consistent with a common sense reading of the Forbearance Agreement as a whole.  See Haffenreffer v. Haffenreffer, 994 A.2d 1226, 1233 (R.I. 2010) (even when contract terms are clear, court may consider situation of parties and

accompanying circumstances in interpreting contract language).  Focusing first on the purpose of

the Agreement, it is entirely consistent that the parties would agree that all documents necessary

to ULLICO <u>taking title to the property</u> were properly escrowed prior to it becoming effective.[5]

By contrast, the receipt of papers documenting the conditional resignations of the condominium

board and of the property manager might make the transition smoother for ULLICO; however,

without them, ULLICO could still record the deed to the property and become the owner.

Moreover, unlike the first set of documents (the deed and materials related to conveyancing),

over which O'Neill had unilateral control, the second set created the risk of delay in that they

required O'Neill to procure consents from third parties who needed to sign off on the

resignations and terminations.  It is contrary to the parties' goal of getting the Forbearance Period

running to create a delay based on the need to provide documents less central to the Agreement's

core purpose that might take time to procure.  Nor does it make sense to read the Agreement so

as to reverse the sequence of the material events; put differently, an interpretation that leapfrogs

the O'Neill Entities' obligation to pay the real estate taxes, so that it arises after ULLICO must

pay the protective advances, is simply not plausible.  And the April 29, 2014, demand by two

O'Neill controlled companies to get the protective advances flowing is consistent with the shared

understanding of all parties that the Forbearance Period had started to run on that day.

 In short, when the Forbearance Agreement is read holistically with a sprinkling of

common sense, <u>HSBC Realty Credit Corp.</u>, 745 F.3d at 574, the resulting interpretation aligns

with that compelled by a read of the plain language – that delivery of the second batch of

documents was not a condition precedent to the effectiveness of the Forbearance Agreement.

---

[5] Consistent with this interpretation, the other condition-precedent documents listed in Section 3.1 are all essential to the core purpose of the Forbearance Agreement; they consist of documents evidencing the capacity of the signing entities, opinions of counsel, O'Neill's marketing plan and documents needed to perfect liens and priority in the collateral.  FA § 3.1(b-e).

Accordingly, there is no need to wrangle with the logic of O'Neill's second proposition – that the delay in the effective date delayed his duty to pay the real estate taxes for a "reasonable time" stretching it past ULLICO's obligation to pay the advancements and converting ULLICO to the status of first-to-breach.[6]

Based on the foregoing, I conclude that the conditions precedent were fulfilled, as a matter of law, when the Agreement was executed and the defined Escrowed Conveyance Documents were delivered to the title company on April 29, 2014.  Therefore, the obligation of the O'Neill Entities to pay the third-quarter real estate taxes by April 30, 2014, as set forth in section 5 of the Agreement was operative; their failure to pay the real estate taxes on that date was an Event of Default as defined in the Forbearance Agreement, which terminated the Forbearance Period.  FA § 11.11.  With the Forbearance Period terminated, O'Neill is liable to ULLICO for breach of the Guaranty and the Forbearance Agreement.

### B.   Waiver

Presented for the first time at oral argument, O'Neill throws a Hail Mary pass in the form of an argument that there is a material factual dispute, precluding summary judgment, over whether ULLICO waived the default that occurred when the O'Neill Entities failed to pay the real estate taxes on April 30, 2014.  United States v. George, 676 F.3d 249, 251 (1st Cir. 2012) ("A Hail Mary pass in American football is a long forward pass made in desperation at the end of a game, with only a small chance of success.").  To buttress this late-breaking argument, O'Neill asks the Court to consider the fact that ULLICO did not take ownership of the property by recording the deed in the land records for several months after the Event of Default, but rather allowed the matter to drift along.  Under this interpretation of events, because ULLICO took no steps to terminate the Forbearance Period, it must have waived the Default so that the

---

[6] But see n.3 supra.

15

Forbearance Period continued, as did ULLICO's obligations.  With O'Neill's obligation to pay

the real estate taxes on April 30, 2014, waived, when ULLICO failed to respond to the request

for a protective advance, as it would have been required to do if the Forbearance Period

continued, ULLICO's non-response to the advancement request breached the Forbearance

Agreement.[7]

Other than ULLICO's delay in recording the deed in the land records, the only other

evidence proffered by O'Neill of ULLICO's alleged waiver is the July 28, 2014, email from an

attorney for ULLICO to an O'Neill attorney, which states that, "the Forbearance Period expired

on July 18," and offers to extend it through August, on the condition that "your client pays the

March real estate taxes by August 15."  ECF No. 24-1.  O'Neill argues that this sentence permits

the inference that the real estate tax-default was waived because otherwise the Forbearance

Period ended on May 1, and would not have continued to the end-date named in the Forbearance

Agreement and mentioned in the email.  Inconsistent with this theory is the email's sign-off:

"ULLICO continues to reserve all rights and remedies."  ECF No. 24-1.

While it is undisputed that ULLICO did not immediately file the deed as it was permitted

to do upon the termination of the Forbearance Period, it was not contractually obliged to do so;

rather, the Forbearance Period ended automatically upon an Event of Default despite ULLICO's

failure to take any affirmative action.  FA § 12.1 ("The Forbearance Period shall immediately

and automatically cease without notice or further action without notice to, or action by, any

party.").  Thus, the plain language of the Agreement establishes that ULLICO's delay does not

permit the inference that ULLICO intended to waive the real estate tax-payment requirement.

To the contrary, read in light of the email on which O'Neill relies, the proffered evidence

establishes only that ULLICO was hoping to renegotiate the defaulted Forbearance Agreement

---

[7] But see n.3 *supra*.

16

and trying to engage in such negotiations <u>without</u> waiving any of its rights.  <u>See</u> ECF No. 24-1

("ULLICO continues to reserve all rights and remedies.").  The email's reference to a

Forbearance Period end-date of July 18[8] (which is not technically accurate if ULLICO is correct

that the Forbearance Period ended on April 30) does not permit the inference of intent to waive

when the intent <u>not</u> to waive is explicitly reinforced by a reservation of rights two sentences later

in the same email.

Most importantly, O'Neill's waiver argument founders on the unambiguous language of

the Forbearance Agreement, which specifically addresses waiver in three provisions.  In Section

1.10, under "Borrower Acknowledgements," the Agreement states:

> <u>No Waiver of Defaults.</u>  Neither this Agreement, nor any actions taken in
> accordance with this Agreement or the Loan Documents, including Lender's
> continued making of Protective Advances (as hereinafter defined) to pay certain
> Operating Expenses, shall be construed as a waiver of or consent to the Existing
> Defaults or any other existing or future defaults under the Loan Documents, as to
> which Lender's rights shall remain reserved.

Relatedly, under Section 16 ("Miscellaneous") is a paragraph labeled "No Waiver," which states:

> No failure to exercise and no delay in exercising, on the part of the Lender or
> Lender [sic] any right, remedy, power or privilege hereunder or under the Loan
> Documents shall operate as a waiver thereof; nor shall any single or partial
> exercise of any right, remedy, power or privilege hereunder preclude any other or
> further exercise thereof or the exercise of any other right, remedy, power or
> privilege.  Further, Lender's acceptance of payment on account of the Obligations
> or other performance by Borrower or Guarantor after the occurrence of an Event
> of Default shall not be construed as a waiver of such Event of Default, any other
> Event of Default or any of Lender's or Lender's rights or remedies.

---

[8] A better interpretation of this sentence of the email is that the writer, an attorney on ULLICO's team, was trying to persuade O'Neill's attorney to engage in a post-Forbearance Period renegotiation.  Without performing a careful legal analysis of what was the actual end-date in light of the Event of Default, he used the short-hand of the contractual end-date to make the point that, no matter how the facts are interpreted, the Forbearance Period was over.

FA § 16.8.  And finally, Section 16.2 crisply states that the terms of the Forbearance Agreement "may not be waived, modified, altered or amended except by agreement in writing signed by all the parties hereto."

Under Rhode Island law, waiver doesn't happen by accident or through inadvertence or by operation of an inaccuracy in phraseology in an email not signed by a principal; rather, as the Rhode Island Supreme Court makes plain, "waiver is the voluntary and intentional relinquishment of a known right."  Sturbridge Home Builders, Inc., v. Downing Seaport, Inc., 890 A. 2d 58, 65 (R.I. 2005).  The burden of proving waiver is on the party asserting it.  Id.  At summary judgment, that party has "the affirmative duty to produce evidence demonstrating the existence of an issue of fact concerning the voluntary relinquishment of a known right."  Id.  To sustain that burden, even an implied waiver "must be proved by a clear, unequivocal, and decisive act of the party who is alleged to have committed waiver."  Id.

Neither ULLICO's delay in recording the deed to the property nor the July 2014 email offering to "extend out the Forbearance Period," while reserving "all rights and remedies," are probative of such "a clear, unequivocal, and decisive act of waiver."  When O'Neill's insufficient waiver proffer is examined against the backdrop of the Forbearance Agreement's prohibition of waiver through anything other than a writing signed by "all the parties," it is clear that he has failed to toss up any facts demonstrating a material dispute regarding whether ULLICO somehow waived the operative Event of Default.

This is not a close call – like most Hail Mary passes, O'Neill's waiver argument falls well short as a matter of law.

### C.    The Last Gasp – Rule 56(d)

With little else to work with, O'Neill argues that ULLICO's motion must be denied because discovery is not complete.  Relying on Fed. R. Civ. P. 56(d),[9] he contends that ULLICO objected to many of his discovery requests and that his counsel, Mr. Cousounis (the attorney now on medical leave), agreed to extend discovery in April 2016 based on the understanding that ULLICO would produce additional discovery.  Soon after, Mr. Cousounis stopped work due to a medical emergency.  These events left O'Neill blindsided when ULLICO filed its motion for summary judgment six weeks later.  ECF No. 24-2 ¶¶ 20-22.  As O'Neill argues in his memorandum of law, "[b]efore Mr. Cousounis's colleagues could fully familiarize themselves with the facts of the case and continue with discovery in his absence, ULLICO filed the instant motion for summary judgment, seeking to avoid its discovery obligations."  ECF 24 at 12.  ULLICO vigorously disputes every aspect of this factual foundation, particularly the implication that it took advantage of an unfortunate medical situation about which it claims it had no knowledge until after the summary judgment motion was filed.

Before turning to the legal viability of the argument, I pause to consider how it fits with what has happened with the case.  In contradiction to his current argument, from the time of Mr. Cousounis's illness, through to and after the filing of the summary judgment motion, O'Neill has utterly failed to make any effort to obtain discovery of facts he now claims he needs to develop

---

[9] Fed. R. Civ. P. 56(d) permits the court to deny, or postpone ruling on, a motion for summary judgment in some instances:

> **(d) When Facts Are Unavailable to the Nonmovant.**  If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its oppositions, the court may:
>> (1) defer considering the motion or deny it;
>> (2) allow time to obtain affidavits or declarations or to take discovery; or
>> (3) issue any other appropriate order.

Prior to a 2010 amendment, this provision was codified as Fed. R. Civ. P. 56(f).  The Advisory Committee note explains: "Subdivision (d) carries forward without substantial change the provisions of former subdivision (f)."  Fed. R. Civ. P. 56(f) advisory committee's note to 2010 amendment.

his affirmative defenses and to oppose the motion.  Instead, and completely inconsistent with his

Fed. R. Civ. P. 56(d) theory, O'Neill signed on to a joint motion to stay discovery that was

submitted to the Court after the summary judgment motion was filed.  ECF No. 30.  While the

joint motion notes in passing that O'Neill's opposition to summary judgment is based in part on

his need for discovery "to support his affirmative defenses," contrary to his Fed. R. Civ. P. 56(d)

argument, the joint motion also recites that both parties have "made diligent, sustained and

reasonable efforts and progress towards completing discovery," and that both have already

produced "in rolling batches thousands of pages of responsive documents (together with

privilege logs) in response to requests for production of documents and ESI."  ECF No. 30 ¶ 5.

Starkly inconsistent with his present argument, the joint motion also states that the"[r]esolution

of Plaintiff's summary judgment motion will determine <u>whether there is any further need for</u>

<u>discovery</u> on liability or damages."  ECF No. 30 ¶ 4 (emphasis supplied).  In reliance on these

recitals, this Court granted the stay, freezing discovery and effectively protecting O'Neill from

seeking the very evidence whose lack he now argues should prevent the Court from addressing

the merits of the summary judgment motion.  ECF No. 31.

Stepping past the skepticism about the viability of the Fed. R. Civ. P. 56(d) argument

caused by the joint motion to stay, I turn next to the applicable law.  Describing Fed. R. Civ. P.

56(d) as a "procedural escape hatch" and "a safeguard against judges swinging the summary

judgment axe too hastily," the First Circuit has set forth guidelines for those seeking to invoke

the rule successfully.  <u>Resolution Trust Corp. v. North Bridge Assocs.</u>, 22 F.3d 1198, 1203 (1st

Cir. 1994); <u>Mattoon v. City of Pittsfield</u>, 980 F.2d 1, 7 (1st Cir. 1992).  This protocol requires

that the party invoking Fed. R. Civ. P. 56(d) must file an affidavit or declaration that is both

timely and authoritative; it should explain why the non-movant is unable to adduce the facts he

needs to oppose summary judgment.  <u>Resolution Trust Corp.</u>, 22 F.3d at 1203.  If the reason is

because discovery is incomplete, then the affidavit or declaration must satisfy three discrete

requirements:

> it should show good cause for the failure to have discovered the facts sooner; it
> should set forth a plausible basis for believing that specified facts, susceptible of
> collection within a reasonable time frame, probably exist; and it should indicate
> how the emergent facts, if adduced, will influence the outcome of the pending
> summary judgment motion.

<u>Id.</u>

With his opposition to the motion for summary judgment, O'Neill's attorney submitted a

declaration that addresses only the first of the First Circuit's three requirements – that is, if

O'Neill's version of the course of discovery is accepted, there is no question that he has

succeeded in showing "good cause for the failure to have discovered the facts sooner."  ECF No.

24-2.  The Coren declaration attaches ULLICO's objections to document requests, recounts the

unfortunate events of Mr. Cousounis's medical emergency, and vaguely claims that there are

unresolved discovery disputes, including an incomplete privilege log.  ECF No. 24-2 ¶¶ 9-16, 19.

He emphasizes that his firm was surprised by ULLICO's filing of its motion for summary

judgment.[10]  ECF No. 24-2 ¶ 20.  However, it ends there – the declaration is completely silent on

whether there is a plausible basis for believing the specified facts may exist, how time-

consuming it would be to collect them and how the emergent facts might influence the outcome

of the pending motion.  And then, after filing this declaration, instead of pressing for the

supposedly necessary discovery, O'Neill joined the motion to stay discovery based on the

representation that "[r]esolution of Plaintiff's summary judgment motion] will determine

---

[10] This leg of the argument is undermined by Fed. R. Civ. P. 56(b), which provides that "a party may file a motion
for summary judgment <u>at any time</u> until 30 days after the close of discovery" (emphasis added).

whether there is any further need for discovery on liability issues or only potentially Plaintiff's

alleged damages."  ECF NO. 30 ¶ 4.

At oral argument, the Court repeatedly[11] pressed O'Neill's attorney for specifics of the

discovery that he would seek if allowed more time.  Ultimately he answered by speculating that

depositions of two or three of the individuals involved with the transaction conceivably would

assist O'Neill in developing his "Hail Mary" argument that ULLICO waived his breach of the

Forbearance Agreement.  This rationale falls far short of meeting the First Circuit's requirement

of "a plausible basis for believing that specified facts . . . probably exist."  Resolution Trust

Corp., 22 F.3d at 1203.  Rather, it amounts to no more than the mere "conjectures" that Mattoon

holds are insufficient.  980 F.2d at 8.  Further, O'Neill has failed to adduce a scintilla of credible

evidence permitting the inference that ULLICO waived the Default, making it implausible, rather

than plausible, that additional discovery would turn some up.  And with waiver specifically and

unambiguously limned in the Forbearance Agreement as requiring a "writing signed by all the

parties hereto," the required proof is not evidence uniquely in the possession of ULLICO in that

O'Neill himself, as a "party," would have to know that such a writing was created.

Based on the foregoing, O'Neill's Fed. R. Civ. P. 56(d) argument that ULLICO's motion

for summary judgment must be denied so that he can pursue unspecified additional discovery is

unavailing; I recommend that the Court reject it.

## IV.    CONCLUSION

Based on the foregoing, I recommend that ULLICO's Motion for Partial Summary

Judgment (ECF No. 22) on Counts I and II of the Complaint, with respect to liability only, be

GRANTED.

---

[11] The hearing notes suggest that this question was asked nine times.

Any objection to this report and recommendation must be specific and must be served and filed with the Clerk of the Court within fourteen (14) days after its service on the objecting party.  See Fed. R. Civ. P. 72(b)(2); DRI LR Cv 72(d).  Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district judge and the right to appeal the Court's decision.  See United States v. Lugo Guerrero, 524 F.3d 5, 14 (1st Cir. 2008); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).


/s/ Patricia A. Sullivan_____
PATRICIA A. SULLIVAN
United States Magistrate Judge
October 25, 2016